1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    GEORGE AGUARISTI,                          No.  1:18-cv-01053-DAD-EPG

12                    Plaintiff,

13         v.                                     ORDER GRANTING DEFENDANTS'
                                                  *DAUBERT* MOTION AND GRANTING
14    COUNTY OF MERCED, et al.,                   DEFENDENTS' MOTION FOR SUMMARY
                                                  JUDGMENT
15                    Defendants.
                                                  (Doc. Nos. 35, 41)
16

17         This matter is before the court on defendants' motion for summary judgment and motion

18   to exclude the testimony of plaintiff's expert witness, both filed on January 27, 2021.[1]  (Doc. Nos.

19   35, 41.)  Pursuant to General Order No. 617 addressing the public health emergency posed by the

20   COVID-19 pandemic, the pending motions were taken under submission on the papers.  (Doc.

21   No. 44.)  For the reasons explained below, the court will grant the pending motions.

22   _____

23   [1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
     overwhelming caseload has been well publicized and the long-standing lack of judicial resources
24   in this district long-ago reached crisis proportion.  While that situation was partially addressed by
     the U.S. Senate's confirmation of a district judge for one of this court's vacancies on December
25   17, 2021, another vacancy on this court with only six authorized district judge positions was
     created on April 17, 2022.  For over twenty-two months the undersigned was left presiding over
26   approximately 1,300 civil cases and criminal matters involving 735 defendants.  That situation
     resulted in the court not being able to issue orders in submitted civil matters within an acceptable
27   period of time and continues even now as the undersigned works through the predictable backlog.
     This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the
28   parties and their counsel.

                                                  1

# BACKGROUND

This case arises from an incident that took place on May 30, 2018 in which defendant law enforcement officers shot and killed plaintiff's dog after entering the gated front yard of plaintiff's property to execute an arrest warrant on one of plaintiff's tenants for a misdemeanor offense related to the truancy of her children from school.

## A.    Factual Background[2]

Plaintiff George Aguaristi ("plaintiff") owns the residential property at 20521 Reynolds Avenue, Dos Palos, California.  (SF ¶ 1.)  That property was fully enclosed with a fence, much of it with barbed wire at its top, and the driveway to the property was likewise gated.  (SF ¶¶ 2, 3.)  At least one "beware of dog" sign was visible from outside of plaintiff's gate.  (SF ¶ 4.)  In May 2018, plaintiff owned and possessed two pit bull dogs.  (SF ¶¶ 21, 26.)

Plaintiff lives in the main house on his property.  (SF ¶ 1.)  There is also a mobile home, a fifth-wheel trailer, and a small studio behind the main house that plaintiff rents out to tenants; all tenants use the 20521 Reynolds Avenue address and share the sole mailbox.  (UF ¶ 4; SF ¶ 9.)

As of May 30, 2018, plaintiff had several tenants.  (UF ¶ 4.)  Plaintiff's tenant Michael Gonzales had been living in the trailer, and plaintiff's tenant Jeremy Ponce had been living in the studio.  (UF ¶ 4.)  Plaintiff had also been renting out the mobile home to Annette Bermea, who was the subject of a misdemeanor arrest warrant related to truancy that had been issued by the Merced County Superior Court on January 8, 2018.  (UF ¶¶ 1, 4; SF ¶ 5.)

Defendant Andrea Valtierra-Gongora ("Valtierra-Gongora"), an investigator with defendant Merced County District Attorney Office ("DA Office"), worked with a local school district to enforce arrest warrants arising out of public-school children being tardy or absent beyond the threshold for a California Penal Code § 272(a)(1) violation.  (UF ¶ 1.)  Defendant Valtierra-Gongora received the arrest warrant issued by the superior court for Ms. Bermea on or

---

[2]  The relevant facts that follow are derived primarily from the parties' joint stipulated facts (Doc. No. 37 ("SF")) and the undisputed facts as stated by defendants and responded to by plaintiff (Doc. No. 50-1 ("UF")).  Plaintiff also filed a separate statement of "disputed" material facts, though it appears from the substance of those statements that plaintiff intends for them to be construed as "undisputed" facts—i.e., his version of events supported by citations to evidence. (Doc. No. 50-2 ("PF")).  This factual background is undisputed, except where otherwise noted.

about February 14, 2018.  (SF ¶ 7.)  Personnel from defendant DA Office reviewed school files to obtain an address for service of the arrest warrant on Ms. Bermea.  (UF ¶ 2.)  There had been some confusion as to whether the correct address for Ms. Bermea was 20521 or 20525 Reynolds Avenue, though review of law enforcement databases and DMV records confirmed that 20521 was correct.  (SF ¶ 8; UF ¶¶ 3, 4.)[3]  Defendant DA Office's database yielded zero prior contacts with this property; that is, defendant DA Office had not contacted anyone at 20521 Reynolds Avenue before the incident on May 30, 2018.  (UF ¶ 8; SF ¶ 13.)  Defendants did not perform a background search of this property address with any other local law enforcement databases, though the parties dispute whether conducting such a search is a routine/common practice.  (UF ¶¶ 8, 9.)  Prior to attempting to execute the arrest warrant on Ms. Bermea, defendant DA Office conducted background research on Ms. Bermea herself, which revealed that at least one of her children was a known gang member.  (SF ¶ 6; UF ¶ 6.)  That research of Ms. Bermea did not reveal that she had any dogs on the premises where she resided.  (UF ¶ 7.)

A team of DA Office investigators prepared a plan to execute multiple arrest warrants on May 30, 2018, including the arrest warrant for Ms. Bermea, which was facially valid and had not become stale.  (SF ¶¶ 11–12, 14.)  Defendant Valtierra-Gongora was the lead investigator on the team.  (SF ¶ 16.)  Another DA Office investigator, defendant Curtis Gorman ("Gorman"), was the supervisor on the team.  (SF ¶ 15.)  The team met on the morning of May 30, 2018 to discuss a plan to execute arrest warrants at multiple sites that day.  (SF ¶ 17.)  There was no discussion at that meeting regarding a dog management plan, i.e., a plan for what the officers would do if they encountered dogs while attempting to execute arrest warrants that day.  (SF ¶ 18.)

Later that morning, when the team of investigators arrived at plaintiff's property to arrest Ms. Bermea, unbeknownst to defendants, plaintiff was asleep inside his home.  (SF ¶¶ 19–20.)  Many of the events that occurred during the incident that morning were captured on video by the

---

[3]  Subsequent to the incident on May 30, 2018, all sources, including plaintiff's own testimony and records, confirmed that 20525 Reynolds Avenue was not a valid address and that despite renting out dwellings on his property, plaintiff's property only has one address:  20521 Reynolds Avenue.  (UF ¶ 5.)  For example, in October 2017, plaintiff gave Ms. Bermea a 3-day Notice to Pay Rent or Vacate, which identified her address as 20521 Reynolds Avenue.  (SF ¶ 10.)

six security cameras that plaintiff had installed on his property.[4]  (UF ¶ 11.)  The video footage from the camera positioned to record a portion of plaintiff's front yard and carport area ("Cam-1") and the camera positioned to record plaintiff's front steps and porch area ("Cam-2"), viewed together, show that just prior to defendants Valtierra-Gongora and Gorman walking up to plaintiff's front gate, plaintiff's two pit bulls were laying on the porch in front of plaintiff's front door.  (Video at 8:52.38.)  Defendants Valtierra-Gongora and Gorman were outside of the closed front gate when they became aware of the dogs; they saw the "beware of dogs" sign and saw the two pit bulls through the fence.  (SF ¶¶ 24–26.)  As they approached the front gate, both pit bulls alerted and ran to the front gate area.  (Video at 8:52.57.)  The parties do not dispute that the dogs approached the gated area where the investigators were standing and barked at them.  (SF ¶ 27.)

The parties dispute aspects of what happened next, specifically whether defendant Gorman shouted at the dogs.  Defendants state that "when the dogs approached, [defendant] Gorman shouted commands and the dogs retreated."  (UF ¶ 12.)  As supporting evidence for this purported fact, defendants cite the video footage, defendant Gorman's deposition testimony, and defendant Gorman's declaration dated January 22, 2021, which defendants filed concurrently with the pending motion for summary judgment.  (*Id.*)  In his declaration, defendant Gorman states that when the pit bulls approached, he "shouted commands at the dogs to stop, be quiet, and leave, and the dogs complied with the commands," and that he "observed one dog retreat to the front porch area of the main residence and the other dog went to the rear of the main residence."  (Doc. No. 38 at ¶ 4.)  However, a few months before defendant Gorman signed that declaration, he testified at his deposition that when he and defendant Valtierra-Gongora first approached the front gate, the pit bulls "barked at us for a couple of seconds and then they walked away, which to

---

[4]  In support of the pending motion for summary judgment, defendants lodged a thumb drive containing video files of the security camera footage that plaintiff produced during discovery. (Doc. No. 43.)  The authenticity of the video footage is not in dispute.  Although the videos have no sound and their picture quality is relatively poor (*see* UF ¶ 11), the synced video footage is still useful evidence in establishing the occurrence of certain actions and the timing of those actions, which are not in dispute.  (Doc. No. 43.)  While the video is played, a timestamp reflects the hour, minutes, and seconds of the footage shown.  In citing to specific portions of the video footage, the court will refer to that timestamp, e.g., Video at 8:50.23.

me [meant] they're not really concerned with us." (Doc. No. 40-5 at 19–20.) During his deposition, defendant Gorman did not mention shouting commands at the dogs. In addition, the video footage offers little evidentiary support because it lacks audio and reflects defendant Gorman from too far of a distance to view whether he appears to be shouting. Viewing this evidence in the light most favorable to plaintiff as the non-moving party, which the court must do, defendants have not established that defendant Gorman "shouted commands" at the pit bulls.

Plaintiff does not dispute that shortly after the pit bulls approached the gate, the dogs walked away, and the pit bull named Samson returned to the front porch. (UF ¶ 13; SF ¶ 21.) Specifically, the video footage shows that approximately one minute after defendants Valtierra-Gongora and Gorman arrived at the front gate, Samson walked away from the gate, through the carport, and up the front porch steps, then he stood and looked toward the front gate for approximately thirty seconds before sitting down and leaning against the front door. (Video at 8:53.25–8:53.48.) The other pit bull remained near the front gate for another minute before walking away, toward the side of plaintiff's front yard, beyond the view of the security cameras. (Video at 8:54.40.)

While defendants Valtierra-Gongora and Gorman stayed near the front gate area, other investigators on the team proceeded to walk along the side of plaintiff's property towards the back. The camera positioned to record a fence on the side of plaintiff's front yard ("Cam-6") shows that approximately thirty seconds after Samson sat down on the porch, three investigators walked along the outside of that side fence toward the back of the property. (Video at 8:54.24.) Sampson remained seated on the porch and looked in the direction of those investigators. (*Id.*) Video footage from Cam-2 and Cam-6 reflects that approximately forty seconds later, a fourth investigator walked up to that side fence, picked up a large stick, and started hitting the top of the fence with the stick. (Video at 8:55.06–8:55.52.) Samson initially stayed seated on the porch looking toward that investigator for approximately fifty seconds before walking down the porch steps toward that side fence area, beyond the view of the security cameras. (Video at 8:55.06–8:55.55.)

/////

The fourth investigator continued to periodically hit the fence with the stick for the next thirty seconds until plaintiff's tenant Mr. Ponce stepped out of his studio in the back of plaintiff's property and began waving his arms at the investigators who were along the side fence. (Video at 8:55.55–8:56.25.) Mr. Ponce then walked around the studio toward the side fence area and spoke with investigators beyond the view of the security cameras. (Video at 8:56.30–8:56.42; SF ¶ 22.) Mr. Ponce told the investigators where Ms. Bermea's residence was located on the property and pointed in the direction of the mobile home, though from where the discussion was taking place, his pointing was also in the direction of the main house, which is located adjacent to the mobile home.[5] (SF ¶ 23; UF ¶ 10.) As one of those investigators walked back along the fence towards the front of the property, Samson returned to the front porch and sat down, while the other pit bull walked through the front yard to the carport area. (Video at 8:57.07–8:57.17.)

Meanwhile, defendants Valtierra-Gongora and Gorman had remained near the front gate area following their arrival and during the less than five minutes that passed before they entered plaintiff's front gate. (Video at 8:52.57–8:57.23.) During this time, defendant Valtierra-Gongora attempted to call Ms. Bermea on the phone, but Ms. Bermea did not answer the phone.[6] (SF ¶¶

---

[5] Defendants do not point to any evidence before the court on summary judgment regarding whether the investigators who spoke to Mr. Ponce had communicated to defendants Valtierra-Gongora and Gorman any of the information that he had provided them. Plaintiff cites to defendant Valtierra-Gongora's deposition testimony as evidence that she failed to communicate with the other investigators on her team and to learn the information Mr. Ponce had provided regarding Ms. Bermea's residence. (PF ¶¶ 26–27.) Specifically, defendant Valtierra-Gongora testified that before she entered the gate, she knew that the other investigators were on the perimeter, but she did not know what they were doing. (Doc. No. 50-4 at 31.) She further testified that she was not aware of any neighbors outside and did not know if any of the investigators had looked around for neighbors or anyone else in the vicinity. (*Id.* at 49.)

[6] The parties dispute the purpose of this phone call. Defendant Gorman stated in his declaration that he directed Valtierra-Gongora to call Ms. Bermea "to try to control the dogs." (Doc. No. 38 at ¶ 6.) However, plaintiff questions defendant Gorman's credibility in making this assertion because he did not mention the phone call at all during his deposition testimony. (PF ¶ 42.) In addition, plaintiff emphasizes that defendant Valtierra-Gongora stated during both her internal interview with a chief investigator on August 14, 2019 and during her deposition on November 6, 2019, that she placed the call to Ms. Bermea "because the gate was closed." (PF ¶ 42; Doc. No. 50-17 at 7; 50-4 at 20.) Accordingly, viewing this evidence in the light most favorable to plaintiff, defendants have not established that it is undisputed that defendant Valtierra-Gongora's purpose in calling Ms. Bermea on the phone was to obtain her assistance in controlling the dogs.

28–29.)  Defendants Valtierra-Gongora and Gorman also discussed a "dog management plan" to use less lethal options in the event the dogs became aggressive.  (UF ¶¶ 14, 16.)  That discussion lasted approximately one minute, and the only two options that they discussed were that defendant Valtierra-Gongora would use pepper spray[7] and defendant Gorman would use an armament systems and procedures ("ASP") baton.[8]  (UF ¶¶ 16–18; PF ¶ 19.)  They did not

/////

/////

---

[7]  It is undisputed that the DA Office has a use of force policy with regard to animals, which authorizes the reasonable use of chemical agents.  (UF ¶ 15.)  The policy does not require the use of or even mention "animal control."  (SF ¶ 30.)  The Merced County Sheriff's Department (a separate department of defendant County of Merced) has an animal control division, but the DA Office does not have its own animal control division.  (UF ¶¶ 25, 26; PF ¶ 20.)

[8]  The parties dispute the extent to which the decision to use pepper spray and a baton was based on defendant Valtierra-Gongora's and defendant Gorman's experiences with encountering dogs in the scope of their duties as law enforcement officers.  (UF ¶ 19.)  Although it is undisputed that both had previous encounters with dogs, plaintiff emphasizes that defendants do not specify the type of dogs (e.g., large, pit bull breed) or whether defendants had encountered more than one dog during those prior experiences.  (UF ¶ 20.)  In responding to interrogatories, defendant Gorman stated that he has "been forced to hit a dog with a baton less than five times over [his] entire career."  (Doc. No. 40-1 at 7.)  Similarly, defendant Valtierra-Gongora was asked in an interrogatory to "state the date of all instances [she has] used pepper spray against a dog," and she responded that "the only date [she] specifically recall[s] using pepper spray against a dog was the date of the incident at hand, i.e., [May] 30, 2018."  (Doc. No. 50-12 at 4.)  Plaintiff relies on this interrogatory response as evidence that this incident was the first time that defendant Valtierra-Gongora ever used pepper spray against a dog.  (UF ¶ 19.)  But the evidence cited does not necessarily support plaintiff's proffered conclusion.  First, defendant Valtierra-Gongora was asked only to state specific dates, not the number of times she used pepper spray against a dog, so her answer that she could not recall any other specific dates does not necessarily mean that she had never used pepper spray against a dog before May 30, 2018.  Second, in asserting this purported fact, plaintiff ignores defendant Valtierra-Gongora's deposition testimony, in which she explained that this was not the first time she used pepper spray against a dog, that she had used pepper spray against a large "pit-bull type of dog" when she went "to another house related to attendance" sometime within the year prior to the May 30, 2018 incident, but that she did not remember the specific date of that incident.  (Doc. No. 40-6 at 30.)  She further testified that when she pepper-sprayed that dog, the dog retreated.  (Id. at 31.)  Even viewing this evidence and the reasonable inferences to be drawn therefrom in the light most favorable to plaintiff, the evidence before the court on summary judgment does not suggest that defendant Valtierra-Gongora never used pepper spray on a dog before this incident and that she therefore could not have drawn on any such experience to inform her decision-making when discussing less lethal options with defendant Gorman.

discuss calling animal control,[9] and they did not discuss what they would do if the use of pepper spray and baton did not work.  (PF ¶¶ 20, 25.)

As defendants Valtierra-Gongora and Gorman entered the front yard, defendant Gorman held only his ASP baton.  (UF ¶ 28.)  Defendant Valtierra-Gongora had her gun on her belt, but she only had the pepper spray at the ready while entering the property.  (UF ¶ 29.)  Unlike when they first approached the gate upon arrival, this time, the pit bulls did not run up to them at the gate or bark at them; Samson was still sitting on the porch and the other pit bull was on the far side of the carport.  (Video at 8:57.23.)  Approximately twenty seconds after entering the yard, as defendant Valtierra-Gongora continued walking toward the porch, Samson stayed seated but began barking.  (Video at 8:57.41.)  During that time, defendant Gorman had walked into the yard but did not approach the front porch; he stopped and stood near the carport, holding his baton. (Video at 8:57.23–8:57.49.)  Approximately three seconds later, Samson stood up and walked down the steps toward defendant Valtierra-Gongora, growling while approaching her.  (Video at 8:57.44; SF ¶ 31.)  After four more seconds, Samson was within approximately three feet of defendant Valtierra-Gongora, and she utilized her pepper spray, spraying towards Samson's face. (SF ¶ 32.)  Samson became more agitated from the pepper spray.  (SF ¶ 33.)  Three seconds later, with Samson continuing to come at her while she backed away, defendant Valtierra-Gongora switched from holding her pepper spray canister to holding her gun in her right hand.  (Video at 8:57.51.)  Another three seconds later, Samson jumped and lunged at defendant Valtierra-

---

[9]  According to defendant Valtierra-Gongora, there was no reason that they did not consider calling animal control for assistance.  (PF ¶ 20.)  Defendant Gorman states in his declaration that DA Office policies do not require or even mention animal control (an undisputed fact) and "it does not make sense to call civilian animal control officers to secure animals on premises that have not been secured by law enforcement officers."  (PF ¶ 20; UF ¶ 27; SF ¶ 44 (stipulating that "animal control officers are not sworn peace officers")).  But defendant Gorman does not explicitly state that those were his reasons for not discussing the option of calling animal control to assist with the dogs on that particular day.  When asked at his deposition whether, in hindsight, calling animal control would have been a good idea, defendant Gorman answered, "yeah, there's always later, you can say, it would maybe have been better to have somebody control the dogs if that's possible, but [that] doesn't necessarily mean an animal control officer could do that." (Doc. No. 50-5 at 5–6.)  During his deposition, defendant Gorman did not mention DA Office procedures, nor the need to first secure the premises, as his reasons for not considering calling animal control—either at the time of the incident or in hindsight.

Gongora's upper body and right arm.  (Video at 8:57.54; SF ¶ 34.)  One second later, defendant

Valtierra-Gongora shot Samson,[10] who then fell to the ground on the walkway and appeared to

stop moving after a few seconds.[11]  (Video at 8:57.55–8:57.57.)  It is undisputed that defendant

Valtierra-Gongora employed lethal force to protect herself, and that she believed she was in

danger of death or serious injury at the time she shot Samson.  (SF ¶¶ 35–36; Doc. No. 37 at 5.)

While defendant Valtierra-Gongora had used the pepper spray and backed away from

Samson, the other pit bull had started running around the area where defendant Gorman was

standing and then ran away behind the carport when Samson was shot.  (Video at 8:57.54–

8:57.57.)  Defendant Gorman did not use his baton to hit either pit bull, and his location as

reflected in the video footage suggests that he was not in close enough proximity to either pit bull

to have done so.  (Video at 8:57.23–8:57.57.)

---

[10]  The parties dispute whether defendant Valtierra-Gongora fired one shot or two shots.
Defendant maintains that she only fired one shot (Doc. No. 57 at 6), whereas plaintiff's tenants
Mr. Ponce and Mr. Gonzales testified during their respective depositions that they heard two
shots.  (PF ¶ 35.)  However, it is worth noting that Mr. Gonzales's testimony in this regard was
equivocal; he testified that he heard two noises like shots, maybe two seconds apart (not back-to-
back), and that what he heard could have been backfires.  (Doc. No. 50-8 at 3.)  But the video
footage reflects that Samson's body immediately fell to the ground when defendant Valtierra-
Gongora fired her gun, and one second later, she bent down to pick up her gun, which she had
dropped.  (Video at 8:57.55–8:57.57.)  This timing indicates that two seconds could not have
passed between a first and purported second shot.  In addition, Mr. Ponce testified that he spent
approximately five minutes talking with investigators outside, then he went back into his studio to
play video games, and seven minutes later he heard two gunshots and people screaming outside.
(Doc. No. 50-6 at 11–13.)  But this timing is likewise inconsistent with the video footage, which
shows Mr. Ponce returning to his studio *after* Samson was shot, not before.  Specifically, video
footage from Cam-9, Cam-3, and Cam-4 shows that Mr. Ponce left his studio door open when he
left to speak to investigators, and approximately two and a half minutes later—which was forty-
five seconds after Samson was shot—Mr. Ponce returned to his studio to close the door, lock up,
and leave; he did not go back inside the studio, to play video games or otherwise.  (Video at
8:56.24–8:58.41; 8:59.15.)

[11]  The parties dispute whether Samson died immediately after being shot.  (UF ¶ 31.)  According
to defendant Gorman, Samson died "within seconds" of being shot.  (Doc. No. 40-5 at 11.)
According to plaintiff, the officers never checked to see if Samson was still alive, and the video
footage shows that Samson lifted his head approximately one minute after he was shot.  (UF
¶ 31.)  Although the video quality is too poor to determine the extent of Samson's movement and
whether such movement was indeed a sign of life, the video footage from Cam-2 does show a
slight movement of Samson's head at that point.  (Video at 8:59.07.)

Less than a minute after the shooting, defendants Valtierra-Gongora and Gorman walked up plaintiff's porch steps and knocked on his front door.[12]  (Video at 8:58.29–8:58.42; SF ¶ 37.) No one answered the door.  (SF ¶ 38.)  After waiting for approximately one minute, defendants Valtierra-Gongora and Gorman exited plaintiff's yard through the front gate and called animal control to come retrieve Samson's body.  (Video at 8:59.34–9:00.00; SF ¶ 39.)

Defendant Gorman and another investigator came back into the front yard a few minutes later and defendant Gorman took photographs to document the scene and picked up a shell casing (or casings) from the ground, before exiting the yard.  (UF ¶ 32; Video at 9:02.53–9:04.26.)

After fifteen minutes, defendant Gorman returned into the yard, stuck his business card in the door jamb of plaintiff's front door, took a photograph of Samson, and then exited the yard. (SF ¶ 42; Video at 9:21.44–9:22:45.)  A few minutes later, defendant Gorman and another investigator returned to the yard, and together they picked up and carried Samson's body out of the gate.  (SF ¶ 40; Video at 9:25.17–9:25.50.)  Then, they came right back into the yard, and defendant Gorman used the water hose located at the front porch area to wash away Samson's blood from the walkway, and when he finished, they left the yard.  (SF ¶ 41; Video at 9:26.05– 9:30.48.)[13]

Defendants do not dispute that the investigators were not in hot pursuit, they were not intending to maintain an element of surprise, and they did not have a sense of urgency to arrest

---

[12]  While they were knocking on the door, video footage from Cam-3 shows that the other pit bull was in the back of plaintiff's property, sitting near a fence in front of Mr. Ponce's studio, and it appears that the pit bull stayed in the back yard area for the remainder of the incident.  (Video at 8:58.42–9:03.12.)

[13]  The parties dispute defendant Gorman's motivations and reasons for taking these actions. According to defendant Gorman, he washed away the blood out of compassion for the pet's owners; he did not want them to come home and see their animal killed in a puddle of blood.  (UF ¶ 32.)  According to plaintiff, defendant Gorman's actions (picking up shell casings, removing Samson's body, and washing away the blood) were actually motivated by an intent to cover up what had happened.  (*Id.*)  Plaintiff points to defendant Gorman's deposition testimony that in his 24–25 years of law enforcement experience, he had never washed away blood from any property before this incident.  (Doc. No. 50-5 at 13.)  Plaintiff also points to defendant Gorman's answers to interrogatories in which he stated that in taking these actions, he was not following any particular DA Office policy, as "there is no specific policy addressing the removal of dog carcasses" or "washing areas where dog carcasses have been."  (Doc. No. 50-9 at 5–6.)

1   Ms. Bermea.  (PF ¶ 29.)  Even after the shooting, and while the investigators were still at

2   plaintiff's property, the investigators did not approach the mobile home, knock on the mobile

3   home door, or otherwise look for Ms. Bermea, who was inside the mobile home at that time.  (PF

4   ¶ 30.)  As of the date of defendant Valtierra-Gongora's deposition on November 6, 2019, the DA

5   Office had not returned to the property in any further attempt to execute the warrant for Ms.

6   Bermea's arrest.  (PF ¶ 31.)

7   **B.   Procedural Background**

8          On February 7, 2019, plaintiff filed the operative second amended complaint ("SAC") in

9   this action against the following named defendants:  County of Merced[14], Merced District

10  Attorney Office, Andrea Valtierra-Gongora, and Curtis Gorman, (collectively, "defendants").

11  (Doc. No. 18.)[15]  In his SAC, plaintiff asserts a claim under 42 U.S.C. § 1983 against defendants

12  Valtierra-Gongora and Gorman for unlawful search and seizure in violation of the Fourth

13  Amendment to the U.S. Constitution, as well as the following state law claims against all

14  defendants:  trespass to chattel, intentional infliction of emotional distress, gross negligence, gross

15  negligence *per se*, and negligence.[16]  (*Id.*)

16  _____

17  [14]  Although plaintiff named the Merced County Sheriff's Department as a defendant in his
    original complaint, plaintiff did not include the Merced County Sheriff's Department in his first
18  amended complaint or in the operative SAC.  (*See* Doc. Nos. 1, 8, 18.)  Accordingly, the court
    will direct the Clerk of the Court to update the docket to reflect that Merced County Sheriff's
19  Department was terminated as a named defendant in this action when plaintiff filed his first
    amended complaint on October 1, 2018.

20
    [15]  Plaintiff's SAC also includes unnamed Doe defendants 1–20, described as "all other law
21  enforcement person that were on Plaintiff's Property on May 30, 2018 during the events that took
    place as part of this claim."  (Doc. No. 18 at ¶ 11.)  Plaintiff's SAC stated that "[o]nce the full and
22  true names, and facts surrounding their liability, become known, the true names will be
    substituted with Doe Defendants."  (*Id.*)  Plaintiff has not sought the court's leave to amend his
23  SAC to substitute the true names of any of the Doe defendants, even though fact discovery in this
    case closed on January 10, 2020.  (*See* Doc. No. 22).  Notably, in his opposition to the pending
24  motion for summary judgment, plaintiff does not mention any of the Doe defendants, by their true
    names or otherwise, despite the fact that their identities appear readily available from the
25  evidentiary record before the court on summary judgment.  Accordingly, Doe defendants 1–20
    are dismissed from this action.
26
27  [16]  After conferring with defendants regarding the pending motions, plaintiff withdrew his
28  trespass claim.  (*See* Doc. No. 37 at 2) ("Plaintiff hereby withdraws the Trespass claim.").

On January 27, 2021, defendants filed the pending motion for summary judgment, or in the alternative, for partial summary judgment, on the grounds that they did not violate plaintiff's constitutional rights, and that even if they did, they are entitled to qualified immunity as to plaintiff's § 1983 claim.  (Doc. Nos. 35; 35-1 at 6.)  As to plaintiff's state law claims, defendants argue that they are entitled to summary judgment because those claims are barred by certain absolute immunities under California law.  (*Id.*)

Also on January 27, 2021, defendants concurrently filed a motion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) to exclude the testimony of plaintiff's expert Dr. Stephen Morewitz on the basis that he is not qualified as a "police practices" expert and his methodology is not sufficiently reliable.  (Doc. Nos. 41, 41-1.)

On March 1, 2021, plaintiff filed oppositions to the pending motions and objections to certain evidence that defendants had submitted.  (Doc. Nos. 46; 50; 50-23.)

On March 9, 2021, defendants filed their replies in support of the pending motions.  (Doc. Nos. 57, 58.)  Defendants also concurrently filed objections to certain evidence that plaintiff submitted in support of his opposition to the pending motions (Doc. No. 60) and a response to plaintiff's evidentiary objections (Doc. No. 59).

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

12

Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

1   trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

2   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

3   *Matsushita*, 475 U.S. at 587 (citations omitted).

4          "In evaluating the evidence to determine whether there is a genuine issue of fact," the

5   court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

6   *Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing

7   party's obligation to produce a factual predicate from which the inference may be drawn.  *See*

8   *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d

9   898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

10  more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where

11  the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

12  there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

13                                    **DISCUSSION**

14  **A.      Evidentiary Matters**

15          1.      Plaintiff's Objections to Defendants' Evidence

16          Plaintiff objects to certain portions of defendant Gorman's declaration as a sham affidavit

17  and to certain paragraphs of the declaration of defendants' expert Robert Fonzi.  (Doc. No. 50-

18  23.)

19          The court does not agree that defendant Gorman's declaration is a sham affidavit, i.e., that

20  he creates an issue of fact by contradicting his own testimony.  *See Van Asdale v. Int'l Game*

21  *Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("The general rule in the Ninth Circuit is that a party

22  cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.")  The

23  Ninth Circuit has advised that the "sham affidavit rule" must be applied with caution, and that the

24  inconsistency between the prior testimony and subsequent affidavit must be clear and

25  unambiguous.  *Id.* at 998–99.  First, plaintiff's argument—that defendant Gorman somehow

26  intended for his declaration to create a genuine issue of material fact—is puzzling and illogical.

27  Defendants are the moving party here; they bear "the burden of proving the *absence* of a genuine

28  issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (emphasis added).

14

1    Second, the objected-to statements in defendant Gorman's declaration are not clearly and

2    unambiguously inconsistent with his prior testimony.  For example, plaintiff objects to defendant

3    Gorman's statement in his declaration that the purpose of placing a phone call to Ms. Bermea was

4    "to try to control the dogs" because defendant Gorman did not state this purpose during his

5    deposition.  (Doc. No. 50-23 at 1–2.)  But, critically, at that deposition plaintiff's counsel never

6    asked defendant Gorman what the purpose was of that phone call to Ms. Bermea.  Plaintiff's

7    other objections to portions of defendant Gorman's declaration ultimately pertain to the

8    credibility and the weight of the evidence, which the court does not consider at the summary

9    judgment stage.  *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630 ("[A]t this [summary judgment] stage

10   of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material

11   fact.  Nor does the judge make credibility determinations with respect to statements made in

12   affidavits, answers to interrogatories, admissions, or depositions.").

13          Accordingly, plaintiff's evidentiary objections Nos. 1–5 are overruled.

14          The court need not address plaintiff's remaining evidentiary objections Nos. 6–7, which

15   pertain to Mr. Fonzi's declaration (Doc. No. 50-23 at 6–8), because the court does not rely on the

16   Fonzi declaration in resolving the pending motion for summary judgment.

17          2.      Defendants' Evidentiary Objections and *Daubert* Motion

18          Defendants object in both their evidentiary objections and their *Daubert* motion to the

19   testimony and opinions of plaintiff's purported expert Dr. Morewitz as inadmissible and

20   irrelevant under Federal Rule of Evidence 702 because he does not qualify as an expert on police

21   practices.  (Doc. Nos. 41, 60.)

22          The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which

23   provides:

24              A witness who is qualified as an expert by knowledge, skill,
                experience, training, or education may testify in the form of an
25              opinion or otherwise if:

26              (a) the expert's scientific, technical, or other specialized knowledge
                will help the trier of fact to understand the evidence or to determine
27              a fact in issue;

28              (b) the testimony is based on sufficient facts or data;

                                            15

1         (c) the testimony is the product of reliable principles and methods; and

2

3         (d) the expert has reliably applied the principles and methods to the facts of the case.

4  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 589 (noting that Rule 702 is the primary locus of

5  the trial court's obligation to "ensure that any and all scientific testimony or evidence admitted is

6  not only relevant, but reliable").  "Expert testimony is admissible pursuant to Rule 702 if it is both

7  relevant and reliable."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citation omitted).  "It

8  is the proponent of the expert who has the burden of proving admissibility."  *Id.* (quoting *Lust By*

9  *& Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

10       The court's gatekeeping role applies to "all forms of expert testimony, not just scientific

11  testimony."  *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002), *opinion amended on*

12  *denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).  When non-scientific expert testimony is proffered,

13  such as expert testimony on police practices and the use of force, "reliability depends heavily on

14  the knowledge and experience of the expert, rather than the methodology or theory behind it."

15  *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (noting that "[t]he *Daubert* factors

16  (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of

17  [police gang expert's] testimony"); *see, e.g.*, *Lopez v. Chula Vista Police Dep't*, No. 3:07-cv-

18  1272-WQH-BLM, 2010 WL 685014, at *1 (S.D. Cal. Feb. 18, 2010) (concluding that a former

19  police sergeant was qualified as an expert on police procedures based on his thirteen years of

20  experience serving in law enforcement); *A.B. v. County of San Diego*, No. 3:18-cv-1541-MMA-

21  LL, 2020 WL 4430971, at *3–4 (S.D. Cal. July 31, 2020) (finding that a police practices expert

22  was qualified to opine regarding Tasers because he had extensive experience in law enforcement

23  and his expert report demonstrated his acquisition of specialized knowledge regarding Taser use

24  standards and training).  "It is the proponent of the expert who has the burden of proving

25  admissibility."  *Cooper*, 510 F.3d at 942 (quoting *Lust By & Through Lust*, 89 F.3d at 598).

26       In their evidentiary objections, defendants object to the portions of Dr. Morewitz's

27  deposition testimony that plaintiff relies on to support his purported fact that "[i]t was

28  unreasonable for defendants to enter the property and face the pit bulls without finishing the

1   onsite investigation and without considering the information obtained from Jeremy Ponce."

2   (Doc. No. 60 at 2.)  Specifically, plaintiff relies upon Dr. Morewitz's opinion that "this whole

3   incident could have been avoided" because defendants Valtierra-Gongora and Gorman "should

4   have waited and never gone in," "should have contacted animal control," "needed to complete

5   their investigation to locate Ms. Bermea," and "didn't need to go into that part of the property."

6   (*See id.* at 2–5.)  Defendants object to this testimony under Rules 401, 403, and 702 of the Federal

7   Rules of Evidence on the grounds that Dr. Morewitz's opinions are irrelevant, the probative value

8   of his opinions is substantially outweighed by the danger of unfair prejudice and confusing the

9   jury, and he is not qualified to testify as an expert on police practices.  (*Id.* at 3–5.)  In stating

10  these objections, defendants incorporate by reference the arguments they made in their pending

11  *Daubert* motion.[17]  (*Id.*)

12      In their *Daubert* motion, defendants argue that Dr. Morewitz lacks the requisite

13  knowledge, skill, experience, training, or education to be qualified as an expert in police practices

14  because he "has no actual law enforcement experience," "has no training in law enforcement

15  practices," and "has absolutely no experience with regard to the standards and practice of

16  executing arrest warrants."  (Doc. No. 41-1 at 3.)  In particular, defendants point to Dr.

17  Morewitz's deposition testimony that:  (i) he did not know the difference in the standards for

18  executing an arrest warrant and a search warrant; (ii) he is not familiar with "POST," which is

19  Peace Officers Standards and Training; and (iii) he did not know that animal control officers are

20  peace officers and expressed that his understanding is that they are "government employees."  (*Id.*

21  at 7–8.)  In addition, defendants emphasize that to prepare for his deposition, Dr. Morewitz

22  searched on Google for law enforcement arrest procedures, clicked on the search result that

23  
_____

24  [17]  Plaintiff initially disclosed Dr. Morewitz as his retained expert to opine on the "impact of the
    killing of Mr. George Aguaristi's dog, Samson, on Mr. Aguaristi's individual, social, financial,

25  and family functioning."  (*See* Doc. No. 40-12 at 5.)  After receiving defendants' disclosure of
    their retained expert on police practices, plaintiff disclosed Dr. Morewitz as a rebuttal expert to

26  opine on "the law enforcement search of Annette Pasillas Bermea on Mr. George Aguaristi's
    property at 20521 Reynolds Ave., Dos Palos, CA 93620 on and around 5.30.18."  (Doc. No. 40-

27  13 at 5.)  Defendants' *Daubert* motion challenges only the police practices aspect of Dr.
    Morewitz's opinions because their pending motion for summary judgment does not pertain to

28  plaintiff's prayer for the award of emotional distress damages.  (Doc. No. 41-1 at 2.)

1  popped up for the San Antonio Police Department's website, and reviewed that department's

2  policies.  (Doc. No. 41-1 at 3–4.)  Based on his review of that police department's standards, Dr.

3  Morewitz opined as to what defendants should have done in connection with this incident.  (*Id.*)

4  Defendants argue that "[t]he standards employed by a different police agency, one that is out of

5  state, no less, do not lend Dr. Morewitz any expertise as to the standards that were to be met in

6  executing the arrest warrant here."  (*Id.* at 8.)

7           Despite bearing the burden of establishing Dr. Morewitz's qualifications to opine on

8  police practices, plaintiff has failed to make any such showing or articulate any counterarguments

9  in opposition to defendants' *Daubert* motion.  Rather, in his opposition, plaintiff merely states in

10  conclusory fashion that "Dr. Morewitz is a leading authority in the field of administration and of

11  criminal justice and its practice," that "[h]is opinions are relevant and probative to the disputed

12  issue(s)," and that "Dr. Morewitz meets the thresholds to testify as an expert witness."  (Doc. No.

13  46 at 2, 3, 6.)  These conclusions are insufficient to establish Dr. Morewitz's qualifications as an

14  expert on police practices.  In addition, although plaintiff incorporates by reference the

15  declaration of Dr. Morewitz that plaintiff filed in support of his opposition (Doc. No. 46-3),

16  plaintiff's opposition brief does not cite to any portion of that declaration or refer the court to any

17  particularly relevant experience described therein.  Instead, plaintiff merely states that Dr.

18  Morewitz's declaration "spells out the specifics of the methodology, acceptance by other

19  professionals and the science, credentials and experience[] complained of by defendants."  (Doc.

20  No. 46 at 4.)  However, the court has reviewed Dr. Morewitz's declaration and finds it utterly

21  lacking any articulated basis in experience, education, skill, or training upon which this court

22  could find him to be an expert qualified to opine on police practices, including the use of force

23  while executing arrest warrants.[18]

24  _____

25  [18]  In his declaration, Dr. Morewitz states that he has a Ph.D. in social sciences, is "a criminal
    justice [and healthcare] organizational/management specialist," and his expert opinions on

26  "effective communication channels" is based on his "work[] with the French Gendarmerie
    Intelligence Service regarding effective ways to communicate with inmates to search for terrorist

27  suspects" and his work related to cultural genocide and missing persons.  (Doc. No. 46-3 at 2–4.)
    These broad statements are insufficient to establish Dr. Morewitz's qualifications to offer the

28  opinions that plaintiff has relied upon in opposing defendants' motion for summary judgment.

18

The court therefore finds that plaintiff has not satisfied his burden to establish Dr. Morewitz's qualifications to offer expert testimony on the police practices.  Accordingly, the court will sustain defendants' evidentiary objections and grant defendants' *Daubert* motion to exclude Dr. Morewitz's testimony regarding police practices in its consideration of the pending motion for summary judgment.

**B.    Defendants' Motion for Summary Judgment**

Defendants move for summary judgment in their favor on plaintiff's § 1983 claim on the grounds that defendants Valtierra-Gongora and Gorman did not violate plaintiff's Fourth Amendment right against unreasonable search and seizure, and that even if they did, they are entitled to summary judgment on qualified immunity grounds.  (Doc. No. 35-1 at 6.)  Defendants also move for summary judgment on plaintiff's state law claims based on absolute immunities under California law.  (*Id.*)

1.    Plaintiff's § 1983 Claim that Defendants Violated the Fourth Amendment

Section 1983 provides that "[e]very person who, under color of any [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured . . . ." 42 U.S.C. § 1983.  "Section 1983 does not create substantive rights; it merely serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir.1991) (citing *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).

The Fourth Amendment protects people from unreasonable searches and seizures of "their persons, houses, papers, and effects."  U.S. Const. amend. IV.  The parties do not dispute that defendants were acting under color of state law during the incident on May 30, 2018.  Therefore, the only remaining questions are whether defendants deprived plaintiff of his constitutional right under the Fourth Amendment to be free from unreasonable searches and seizures, and if so, whether defendants are entitled to summary judgment based on their affirmative defense of qualified immunity.

/////

a.      *Reasonableness of Search — Defendants' Entry into Plaintiff's Curtilage*

Searches inside a home, and in the curtilage of a home, without a warrant are presumptively unreasonable.  *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)).

Here, plaintiff has predicated his § 1983 claim in part on the allegation in his SAC that "[d]efendants entered and/or searched plaintiff's property illegally and without a sufficient warrant."  (Doc. No. 18 at ¶ 49.)  But in opposing defendants' motion for summary judgment, plaintiff has effectively conceded that defendants' entry into his curtilage was not an unreasonable search.  Specifically, plaintiff does not dispute that when defendants entered his front gate, they had a valid arrest warrant for Ms. Bermea, who lived on plaintiff's property and shared his sole address at 20521 Reynolds Avenue.  (SF ¶ 8; UF ¶¶ 3, 4.)  In addition, in his opposition to the pending motion for summary judgment, plaintiff does not address defendants' argument that "[s]ince all of the evidence confirms that Ms. Bermea's residence address was 20521, the investigators had probable cause to execute the arrest warrant there."  (Doc. No. 35-1.)

Because defendants had a valid arrest warrant for Ms. Bermea and she shared plaintiff's 20521 Reynolds Avenue address, defendants' entry into the front gate and curtilage of plaintiff's property at that address to execute that arrest warrant did not violate plaintiff's Fourth Amendment right against unreasonable searches.  *See Payton*, 445 U.S. at 603 (concluding that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within"); *United States v. Gooch*, 506 F.3d 1156, 1161 (9th Cir. 2007) (holding that "a valid arrest warrant . . . carries with it the limited authority to enter a residence in order to effectuate the arrest," "regardless of whether that warrant is for a felony, a misdemeanor, or simply a bench warrant for failure to appear").

In short, the evidence before the court on summary judgment plainly refutes plaintiff's allegation in his SAC that defendants entered his property illegally and without a valid warrant.  Moreover, plaintiff has made no attempt to come forward with any evidence on summary judgment in support of his claim that defendants violated his Fourth Amendment right by entering

20

1    his front gate and curtilage to execute the valid arrest warrant for Ms. Bermea and that claim is

2    otherwise unsubstantiated.

3        Accordingly, the court will grant defendants' motion for summary judgment as to

4    plaintiff's § 1983 claim to the extent that claim is predicated on plaintiff's allegation of a Fourth

5    Amendment search violation.  Because the court concludes that there was no search and seizure

6    based Fourth Amendment violation, the court need not address whether defendants are entitled to

7    qualified immunity for their entry onto plaintiff's property.

8            b.    *Reasonableness of Seizure and Qualified Immunity:  Shooting of the Dog*

9                1.    Legal Standard

10       The destruction of property by state officials constitutes a "seizure" under the Fourth

11   Amendment.  *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by*

12   *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002).  "'The killing of [a] dog is a

13   destruction recognized as a seizure under the Fourth Amendment' and can constitute a cognizable

14   claim under § 1983."  *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*

15   (*Hells Angels*), 402 F.3d 962, 975 (9th Cir. 2005) (citation omitted); *see also Viilo v. Eyre*, 547

16   F.3d 707, 710 (7th Cir. 2008) (noting that "[e]very circuit that has considered the issue has held

17   that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth

18   Amendment").

19       To be constitutional under the Fourth Amendment, the shooting and killing of a

20   companion dog "must have been reasonable under the circumstances."  *Hells Angels*, 402 F.3d at

21   975.  "Reasonableness is the touchstone of any seizure under the Fourth Amendment."  *Id.*

22   Courts "look to the totality of the circumstances to determine whether the destruction of property

23   was reasonably necessary to effectuate the performance of the law enforcement officer's duties."

24   *Id.*  Seizures become unlawful when they are "more intrusive than necessary."  *Id.* (quoting

25   *Ganwich v. Knapp*, 319 F.3d 1155, 1122 (9th Cir. 2003)).  Thus, in examining the reasonableness

26   of a seizure, the court must balance "the nature and quality of the intrusion on the individual's

27   Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.*

28   (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "[T]he killing of a dog is a severe

intrusion into a person's Fourth Amendment interest because 'dogs are more than just a personal effect.'" *Gregory v. City of Vallejo*, 63 F. Supp. 3d 1171, 1178 (E.D. Cal. 2014) (quoting *Hells Angels*, 402 F.3d at 975) ("The emotional attachment to a family's dog is not comparable to a possessory interest in furniture.").  Officer safety is a countervailing government interest where a dog poses an imminent threat to the safety of a law enforcement officer.  *Criscuolo v. Grant County*, 540 F. App'x 562, 564 (9th Cir. 2013)[19]; *LeMay v. Mays*, 18 F.4th 283, 287 (8th Cir. 2021) (noting that "[i]t is clearly established that an officer cannot shoot a dog in the absence of an objectively legitimate and imminent threat to him or others") (citing *Hells Angels*, 402 F.3d at 977–78).  The governmental interest of safety may provide "sound justification" for shooting a dog where officers are surprised by the presence of the dog, but that justification is less convincing where officers are aware of the dog and have time to consider using non-lethal means to control the dog.  *Hells Angels*, 402 F.3d at 977.

In determining whether the killing of a dog to protect officer safety was reasonable, courts have considered numerous factors in assessing the totality of the circumstances facing the officer at the time in question.  For example, courts consider whether the officer considered less intrusive alternatives.  *Id.*  "The Fourth Amendment forbids the killing of a person's dog, or the destruction of a person's property, when that destruction is unnecessary—i.e., when less intrusive, or less destructive, alternatives exist."  *Id.* at 977–78.  As the Ninth Circuit held in *Hells Angels*, "[a] reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method of subduing the dogs besides killing them, would violate the Fourth Amendment."  *Id.* However, "[a]n officer need not use the least harmful alternative in dealing with a dangerous situation in which officer safety is an issue."  *McCarthy v. Kootenai County*, No. 2:08-cv-294-N-EJL, 2009 WL 3823106, at *6 (D. Idaho Nov. 12, 2009) (noting that "[r]equiring the least intrusive alternative is not a realistic approach where law enforcement officers have to make split second decisions regarding their safety") (citing *Graham*, 490 U.S. at 396).

---

[19] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

Courts also consider the demeanor of the dog at the time of the incident, such as whether it appeared aggressive by barking and snarling. *Gregory*, 63 F. Supp. 3d at 1178 (noting that the dog was barking, snarling, showing its teeth, and had the hair on the back of its neck raised with its tail straight as opposed to wagging). The breed of the dog, its size, and its characteristics for aggressive behavior may also factor into the reasonableness inquiry. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 572 (6th Cir. 2016) (emphasizing the dog's breed and taking into account "the nature and size of the dogs"); *Niesen v. Garcia*, No. 2:14-2921-WBS-CKD, 2016 WL 4126382, at *9 (E.D. Cal. July 5, 2016) (noting that "[t]he deputies were also dealing with a breed of dog, [a pitbull], that is known for fighting, aggressive behavior, and causing serious injury").

Ultimately, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

2.      Analysis

The court begins its analysis in this case with defendants' qualified immunity defense because, even if a reasonable trier of fact could find that the shooting of Samson was an unreasonable seizure in violation of plaintiff's Fourth Amendment right, for the reasons explained below, the court concludes that defendants are nevertheless entitled to summary judgment based on qualified immunity grounds.

"Qualified immunity protects government officials from suits for money damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (citation and internal quotation marks omitted). "Once the official pleads qualified immunity, the burden is on the plaintiff to prove two elements: (1) that the right was violated; and (2) that the right was clearly established at the time of the alleged misconduct." *Id.*

1  Courts have discretion to choose the order in which to answer these elements.  *Pearson v.*

2  *Callahan*, 555 U.S. 223, 236 (2009).  Here, the court will only address whether the plaintiff's

3  constitutional right was clearly established at the time of the incident—as that analysis is

4  dispositive of the pending motion.  *See Niesen*, 2016 WL 4126382, at *5 ("assum[ing], without

5  deciding, that the deputies violated plaintiff's Fourth Amendment right when they shot her two

6  dogs," and proceeding to the second prong of the qualified immunity analysis because "this is the

7  type of case the Supreme Court had in mind when it determined that a court may assume the

8  existence of a constitutional violation on the first inquiry and then determine whether the

9  constitutional right was clearly established").

10       "A clearly established right is one that is 'sufficiently clear that every reasonable official

11  would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7,

12  11–12 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Although "a case directly

13  on point" is not required, "existing precedent must have placed the statutory or constitutional

14  question beyond debate."  *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).  "Put simply, qualified

15  immunity protects 'all but the plainly incompetent or those who knowingly violate the

16  law.'"  *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

17       "In cases alleging unreasonable searches or seizures, [the Supreme Court has] instructed

18  that courts should define the 'clearly established' right at issue on the basis of the 'specific

19  context of the case.'"  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Saucier v. Katz*, 533

20  U.S. 194, 201 (2001)).  The Supreme Court has "repeatedly told courts—and the Ninth Circuit in

21  particular—not to define clearly established law at a high level of generality."  *Ashcroft v. al-*

22  *Kidd*, 563 U.S. 731, 742 (2011).  "The dispositive question is 'whether the violative nature of

23  *particular* conduct is clearly established.'"  *Mullenix*, 577 U.S. at 12 (emphasis in original)

24  (quoting *al-Kidd*, 563 U.S. at 742).  Thus, this inquiry must be undertaken in light of the specific

25  context of the particular case, rather than as a broad general proposition.  *Id.*

26       Here, the undisputed facts establish that at the time defendant Valtierra-Gongora shot

27  Samson, she feared for her safety, she believed that she was in danger of death or serious injury,

28  and she used lethal force to protect herself.  (SF ¶¶ 35–36.)  Importantly, there is no dispute that

1  when defendant Valtierra-Gongora walked towards the porch and Samson approached her while

2  growling, she first employed the non-lethal response method of deploying pepper spray, which

3  was part of the dog management plan she had discussed with defendant Gorman prior to their

4  entry.  (SF ¶ 32.)  There is also no dispute that defendant Valtierra-Gongora only resorted to

5  lethal force in self-defense when the pepper spray she deployed failed to subdue Samson and he

6  instead became more agitated and lunged at her.  (SF ¶¶ 32–35.)  Although there is no question

7  that the shooting of plaintiff's companion dog Samson constitutes a severe intrusion on plaintiff's

8  Fourth Amendment right, considering the undisputed facts and the evidentiary record before the

9  court on summary judgment, defendant Valtierra-Gongora's safety was a strong countervailing

10 government interest given the imminent threat of harm that Samson posed to her *at that time*—

11 i.e., after defendants had already entered plaintiff's gate and defendant Valtierra-Gongora

12 approached the front porch of the main residence.

13         Moreover, the evidence before the court on summary judgment establishes that although

14 the two pit bulls ran up to the gate and barked at defendants when they first arrived at plaintiff's

15 property, the pit bulls thereafter left the front gate area and did not similarly approach and bark

16 when defendants came to the gate again, prior to their entry.  The pit bulls were not at the gate

17 barking, snarling, or showing their teeth to defendants.  This is a relevant circumstance to

18 consider when defining the constitutional right in the context of this case because it speaks to

19 defendants' perspective at the time of their actions, rather than the viewing of the situation faced

20 with "the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396; *see, e.g.*, *White v. Detroit*, No.

21 2:20-cv-12646-MAG-KGA, 2021 WL 5114583, at *5 (E.D. Mich. Nov. 3, 2021), *aff'd sub nom.*,

22 *White v. City of Detroit, Michigan*, No. 21-1746, 2022 WL 2187834 (6th Cir. June 17, 2022)

23 (explaining that "because even seemingly friendly dogs can act aggressive at times, [officer]

24 Cherry's most prudent course of action would have been to keep [police canine] Roky farther

25 away from [plaintiff's] fence.  But the fact that Cherry could have acted more cautiously does not

26 render her actions unreasonable," and concluding that "[b]ecause [plaintiff's pit bull] Chino did

27 not display any overtly aggressive behavior before the attack, the Court cannot say that the

28 confrontation between Chino and Roky was the result of Cherry's 'plain incompetence.'"); *see*

1  *also White*, 2022 WL 2187834, at *3 ("[T]he question at hand is whether the officer behaved

2  reasonably at the time of the encounter, 'not whether it was reasonable for the police to create the

3  circumstances.'") (citation omitted).

4        In opposing defendants' motion for summary judgment, plaintiff argues that defendants'

5  actions prior to entering plaintiff's property render the shooting of Samson unreasonable under

6  the circumstances, particularly because defendants did not exhaust all other non-lethal options.

7  (Doc. No. 50 at 16.)  Plaintiff's position is essentially that an otherwise reasonable use of force—

8  shooting a dog in self-defense after a non-lethal method fails to subdue the dog—is rendered

9  unreasonable if the officer knew the dog was present and did not exhaust all non-lethal options

10  prior to *entering* the property.  (Doc. No. 50 at 14–21.)  According to plaintiff, it was clearly

11  established at the time of this incident that because defendants knew of the presence of the pit

12  bulls and they were serving a low-priority misdemeanor arrest warrant, their dog management

13  plan had to include considering and exhausting all available non-lethal options, specifically

14  including calling animal control officials and asking a third party (tenant Mr. Ponce) to secure the

15  dogs, "prior to even facing the dogs with a non-deadly weapon such as pepper spray."  (Doc. No.

16  50 at 24–25.)  To support his position, plaintiff relies on two Ninth Circuit opinions (*Hells Angels*

17  and *Thurston v. City of N. Las Vegas Police Dep't*, 552 F. App'x 640, 643 (9th Cir. 2014)) and

18  two decisions of this district court (*Niesen* and *Perez v. City of Placerville*, No. 2:07-cv-927-

19  FCD-GGH, 2008 WL 4279386, at *8 (E.D. Cal. Sept. 9, 2008)).  (Doc. No. 50 at 24.)  But none

20  of the decisions in those cited cases stand for the proposition that plaintiff contends is established

21  law:  that officers must exhaust all non-lethal options before entering property where they know

22  dogs are present, unless there are exigent circumstances.

23        The Ninth Circuit in *Hells Angels* put beyond any debate that officers violate the Fourth

24  Amendment when they enter a person's property knowing that there are dogs present "without

25  considering a method for subduing the dogs besides killing them."  402 F.3d at 978.  But the

26  Ninth Circuit did not hold in *Hells Angels*, or in any other case, that the Fourth Amendment is

27  violated if officers do not exhaust all non-lethal options, or if they do not use several non-lethal

28  options before employing lethal force.  While there is a factual dispute here regarding whether

defendants actually used certain other non-lethal means (such as defendant Gorman shouting commands at the dogs, or defendant Valtierra-Gongora calling Ms. Bermea with the purpose of having her come control the dogs), there is no dispute that the defendants' dog management plan involved defendant Valtierra-Gongora using pepper spray (a method she had previously employed to successfully subdue a "pit-bull type of dog") and defendant Gorman using a baton (a method he too had previously used). Thus, this is not a situation such as that confronted by the Ninth Circuit in *Hells Angels*, in which the officers violated clearly established law by planning to use only lethal force on aggressive dogs that they knew they might encounter while executing a search warrant, with no plan for less lethal options whatsoever. *See Hells Angels*, 402 F.3d at 978.

Plaintiff's reliance on the Ninth Circuit's decision in *Thurston* is also unavailing. In that case, the Ninth Circuit reversed the district court's granting of summary judgment because there were genuine issues of material fact as to the reasonableness of the police officers' conduct in shooting the plaintiff's pet pit bull and mastiff. *Thurston*, 552 F. App'x at 642.[20] There, the officers entered plaintiff's home to execute a search warrant under circumstances posing a high-risk and "waited 20 minutes after entering the home before firing on the dogs," allegedly in response to the dogs attacking the officers, which was a disputed factual issue. *Id.* The Ninth Circuit emphasized that the reasonableness of the officers' conduct was called into question given that their "department policy dictates attendance, if not participation, of an animal control officer whenever police know there are dogs present inside a home," and the evidence presented on summary judgment raised an inference that "the officers had enough time to observe the dogs' behavior and summon animal control specialists before the alleged attack occurred." *Id.* In contrast to the evidence presented on summary judgment in *Thurston*, here it is undisputed that defendant DA Office's policy did not require or even mention "animal control," and the DA Office did not have an animal control division. (UF ¶¶ 25, 26; SF ¶ 30.) Moreover, contrary to plaintiff's interpretation of the holding in *Thurston*, the Ninth Circuit did not hold that it is clearly

---

[20] Again, citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   established law that in any situation where officers know dogs are present on the property they

2   are entering and there is no urgency, the officers must call animal control before entering the

3   property.  Rather, the Ninth Circuit quoted its decision in *Hells Angels* and concluded that the

4   plaintiff in *Thurston* had a clearly established right to have officers "consider[] a method of

5   subduing [her] dogs besides killing them," which the evidence presented on summary judgment

6   in that case suggested they did not do.  552 F. App'x at 643.

7         Plaintiff's reliance on the decision in *Niesen* fares no better.  In *Niesen*, the district court

8   concluded that sheriff's deputies were entitled to qualified immunity because it was not "clearly

9   established on December 17, 2012 that an officer's shooting of a dog while conducting a lawful

10   residential search violates the Fourth Amendment when the dog is running toward the officer

11   after unexpectedly escaping from a room and after less intrusive methods to control the dog have

12   failed."  *Niesen*, 2016 WL 4126382, at *7.  In that case, the deputies entered the plaintiff's home

13   to conduct a probation search of her boyfriend, who resided there, and the deputies observed three

14   pit bulls barking and growling in a bedroom.  *Id.* at *1–2.  The deputies then called the animal

15   control division of their department to secure the pit bulls so that they could search the bedroom.

16   *Id.*  Although the animal control officer successfully used a snare pole on one of the pit bulls, the

17   other two pit bulls unexpectedly escaped from the room.  *Id.*  A deputy tased the second pit bull,

18   but the taser wires dislodged, and both pit bulls ran towards other deputies, who then shot them.

19   *Id.*  In analyzing the officers' qualified immunity defense, the district court in *Niesen* defined the

20   inquiry as whether the deputies considered "less intrusive methods"—plural—because the

21   deputies had attempted to use two non-lethal methods (calling animal control and the taser), and

22   courts necessarily draw on the context and circumstances of the particular case when addressing

23   qualified immunity.  But the district court's analysis in *Niesen* does not provide any support for

24   the conclusion that an officer who uses only *one* non-lethal method before resorting to the use of

25   lethal force violates clearly established law.  Moreover, it is undisputed that in this case, the dog

26   management plan did include two non-lethal methods overall, even if the incident ultimately

27   involved only defendant Valtierra-Gongora's use of pepper spray and not defendant Gorman's

28   use of his baton.

Finally, plaintiff has not articulated how the court's decision in *Perez* supports his argument that several non-lethal methods must be exhausted before an officer can resort to the use of lethal methods regardless of the circumstances faced by the officer.  In *Perez*, the district court addressed only the first prong of the qualified immunity defense.  *Perez v. City of Placerville*, No. 2:07-cv-927-FCD-GGH, 2008 WL 4279386, at *2, 8 (E.D. Cal. Sept. 9, 2008).  There, the court concluded that the defendant officer did not violate the Fourth Amendment when he attempted to execute an arrest warrant on plaintiff's boyfriend and shot plaintiff's rottweiler three times because his use of pepper spray failed to stop the rottweiler's attack on a fellow officer and police canine.  (*Id.*)  In so concluding, the district court emphasized that "exigent circumstances were present" because the officers suspected a dog might be present but had no confirmation that a dog was present, and they were caught by surprise when they opened a gate slightly and the rottweiler immediately attacked.  *Id.* at *8.  Notably, the court in *Perez* did not address whether the constitutional right at issue was clearly established; rather, the court found no constitutional violation under the facts of that case.

The fact of surprise and exigent circumstances distinguishes *Perez* from this case.  Relying on this distinguishing fact, plaintiff apparently inverts the facts and conclusion of the court in *Perez* in an effort to support his position, i.e., the officer in *Perez* did not violate the Fourth Amendment when he was surprised by the dog, used pepper spray first, and then lethal force, whereas defendant Valtierra-Gongora was *not surprised* by the dog, so a reasonable official in her position would have understood that using only pepper spray before resorting to lethal force violates the Fourth Amendment.  The court is not persuaded by plaintiff's inversion of the district court's conclusion in *Perez*.  That surprise and exigent circumstances were present in that *Perez* does not mean that surprise and exigent circumstances must be present in order for an officer to reasonably use pepper spray as the only non-lethal method before resorting to lethal force.  Even if it would arguably be unreasonable to for an officer to resort to lethal force absent surprise and exigent circumstances, such a holding has not been clearly established by existing precedent on this issue.

/////

In sum, plaintiff has not met his burden of showing that it was clearly established on May 30, 2018 that defendants' conduct violated a right protected under the Fourth Amendment. Specifically, plaintiff has not shown that it was clearly established on May 30, 2018 that an officer's shooting of a dog after entering property to execute a valid arrest warrant violates the Fourth Amendment when, at the time of entry, the officers knew dogs were present but observed the dogs leave the entry area, the dogs did not bark or growl at the two officers upon entry, the two officers had planned to use one non-lethal method each if the dogs became aggressive (pepper spray and a baton), and one officer resorted to lethal force only after her use of pepper spray failed to subdue the dog who had become aggressive and lunged at her.  While it is true that "a case directly on point" is not required, plaintiff here has certainly not shown that "existing precedent" placed the "constitutional question beyond debate."  *See al–Kidd*, 563 U.S. at 741; *see, e.g.*, *Wickersham v. Washington*, 694 F. App'x 559, 560–61 (9th Cir. 2017)[21] (affirming the district court's granting of summary judgment on qualified immunity grounds where the plaintiffs "failed to identify any clearly established law indicating that . . . [the state department of fish and wildlife officer] violated the law" when she shot plaintiffs' dog, given the "uncontroverted testimony that the [] dog lunged at [her]" while she was at plaintiffs' home to investigate a suspected incident of fishing without a license).

Accordingly, the court finds that defendants are entitled to qualified immunity for the shooting of plaintiff's dog, Samson.[22]

           c.     *Reasonableness of Seizure and Qualified Immunity:  Removing the Body*

Plaintiff also predicates his Fourth Amendment seizure claim on the conduct of defendant Gorman in removing Samson's body from plaintiff's yard after the fatal shooting.  (Doc. No. 50

---

[21]  Again, citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

[22]  On prior occasions the undersigned has "join[ed] with those who have endorsed a complete re-examination of the [qualified immunity] doctrine which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases."  *See, e.g.*, *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697, n.6 (E.D. Cal. 2019); *Atayde v. Napa State Hosp.*, 1:16-cv-00398-DAD-SAB, 2022 WL 1215234, at *11, n. 9 (E.D. Cal. Apr. 25, 2022).  However, the undersigned does not view this as one of those many cases.

at 26–27.)  Plaintiff emphasizes that defendant Gorman's motivations in doing so are disputed; plaintiff maintains these actions represent a cover-up of wrongdoing, whereas defendant Gorman asserts that he was motivated by compassion.  (*Id.*; Doc. No. 35-1 at 23–24.)  However, even if defendant Gorman's subjective motivations are in dispute, his conduct is not disputed.  The evidence presented on summary judgment establishes the following.  Defendant Gorman first documented the scene by taking photographs, including of the deceased dog's body, and then, with the assistance of another officer, removed the body from the yard so that animal control could come pick it up.  Defendant Gorman then washed away the dog's blood from the walkway and left his business card in the residence's front door jamb so that the dog's owner could call him, and he could tell the owner how to retrieve the dog's body from animal control.

Defendants argue that these actions were objectively reasonable under the circumstances and thus, they are entitled to qualified immunity for their removal of Samson's body.  (Doc. No. 35-1 at 23.)  Defendants also argue that because a seizure under the Fourth Amendment requires a meaningful interference with a person's possessory interest in the property, defendants' conduct was not a Fourth Amendment "seizure."  (Doc. Nos. 35-1 at 23) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property.")).

In his opposition, plaintiff focuses only on defendant Gorman's motives and does not counter defendants' argument that the removal of Samson's body did not constitute a seizure under the Fourth Amendment.  (Doc. No. 50 at 26–27.)  Plaintiff likewise does not address defendants' argument that any invasion of his possessory rights in Samson's deceased body at the time of removal was *de minimis*.  (Doc. No. 57 at 14.)

The court is skeptical of plaintiff's conclusory assertion that removing Samson's body was an unreasonable seizure under the Fourth Amendment, particularly given that defendant Gorman had contacted animal control to pick up Samson's body and had left his business card for plaintiff to contact him regarding retrieving Samson's body from animal control.  But even assuming that the removal of Samson's body was a seizure under the Fourth Amendment, and even accepting plaintiff's view that defendant Gorman had a subjective intent to cover-up

defendants' wrongdoing, plaintiff has not shown that defendant Gorman's actions were objectively unreasonable or a clear violation of law.  Confronting the situation that defendant Gorman faced on May 30, 2018—where there was a fatally shot dog in a puddle of its own blood on a walkway of property where children may be present, and no one is answering the door (suggesting that the owner was not present)—a reasonable officer would not have known that removing the body and washing away the blood would be an unreasonable seizure in violation of the Fourth Amendment.  Indeed, plaintiff has not cited any legal authority to the contrary.

Accordingly, the court concludes that defendants are entitled to qualified immunity as to plaintiff's claim based upon their removal of Samson's body.

Having found that defendants are entitled to qualified immunity for both the shooting of Samson and the removal of Samson's body, the court will grant defendants' motion for summary judgment on plaintiff's claim, brought under § 1983, that defendants engaged in an unlawful seizure in violation of the a Fourth Amendment.

2.      Plaintiff's State Law Claims

This case was originally filed in this court on the basis of federal question jurisdiction. (*See* Doc. No. 1 at ¶ 1.)  Because the court has concluded that summary judgment must be granted in favor of defendants as to plaintiff's sole federal claim under 42 U.S.C. § 1983, only plaintiff's state law causes of action remain.

Once all federal claims have been dismissed from a case, whether to retain jurisdiction over any remaining state law claims is left to the discretion of the district court.  *See* 28 U.S.C. § 1367(c)(3); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997).  Generally, if federal claims are dismissed prior to trial, state law claims should be remanded to state court "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (noting that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").  If the court declines to exercise supplemental jurisdiction over the state-law claims in a

1   case initially filed in federal court, the court must dismiss those claims without prejudice.  *See*

2   *Carnegie-Mellon Univ.*, 484 U.S. at 350–51 (concluding that "[w]hen the balance of these factors

3   indicates that a case properly belongs in state court, . . . the federal court should decline the

4   exercise of jurisdiction by dismissing the case without prejudice" because "remand [is] not an

5   option").  The factors to be weighed are "the values of judicial economy, convenience, fairness,

6   and comity."  *Id.* at 350.

7        Here, while judicial economy might arguably be served by retaining jurisdiction over

8   plaintiff's state law claims, the court concludes that the exercise of supplemental jurisdiction is

9   not warranted in this case.  The parties have raised multiple arguments related to the application

10   of California law, including a self-defense claim to plaintiff's cause of action for trespass to

11   chattels, and the application of various California immunity statutes.  (*See* Doc. Nos. 35-1 at 24–

12   26; 50 at 27–30.)  These disputes are best determined by state courts, since the role of the federal

13   courts in addressing state law claims is to attempt to divine how the California Supreme Court

14   would determine any particular issue.  *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th

15   Cir. 1994) ("Where the state supreme court has not spoken on an issue presented to a federal

16   court, the federal court must determine what result the state supreme court would reach based on

17   state appellate court opinions, statutes, and treatises.").  This is a task for which the state courts

18   are better suited and declining to exercise supplemental jurisdiction under such circumstances is

19   appropriately respectful of the dual sovereignty of the federal government and the state of

20   California.  Moreover, since this is only the second motion filed in this case on which the court

21   has ruled, judicial economy does not compel the exercise of supplemental jurisdiction over

22   plaintiff's remaining state law claims.  Similarly, both parties are located in California and are

23   represented by California lawyers, thereby minimizing any concerns of convenience or fairness.

24   In sum, the court finds the interests of comity and justice are best served by this court declining

25   /////

26   /////

27   /////

28   /////

the exercise of supplemental jurisdiction over these remaining state law claims.[23]  *See Newman v. County of Fresno*, No. 1:16-cv-01099-DAD-BAM, 2018 WL 3533463, at *8 (E.D. Cal. July 20, 2018) (dismissing the plaintiff's state law claims of trespass to chattel, conversion, negligence, and intentional infliction of emotional distress because the defendant officer who shot plaintiff's dog was entitled to summary judgment as to plaintiff's sole federal claim brought under § 1983 for unreasonable seizure in violation of the Fourth Amendment).

For these reasons, plaintiff's state law claims will be dismissed without prejudice.

## CONCLUSION

Accordingly,

1. Defendants' *Daubert* motion to exclude the testimony of plaintiff's expert Dr. Stephen Morewitz on police practices (Doc. No. 41) is granted;

2. Defendants' motion for summary judgment (Doc. No. 35) is granted as to plaintiff's federal claim brought pursuant to 42 U.S.C. § 1983;

3. The court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims;

4. Plaintiff's state law claims are dismissed without prejudice;

5. The Clerk of the Court is directed to enter judgment for defendants as to plaintiff's § 1983 claim;

/////
/////
/////
/////
/////

---

[23]  This conclusion is aided by the recognition that any applicable statute of limitations under state law has been tolled during the pendency of this litigation.  *See* 28 U.S.C. § 1367(d) (tolling the limitation period for any claim asserted in a federal action by way of supplemental jurisdiction both while the claim is pending "and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"); *Artis v. District of Columbia*, ___ U.S. ___, ___, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, i.e., to stop the clock.").

6.      The Clerk of the Court is also directed to update the docket to reflect that Merced County Sheriff's Department was terminated as a named defendant in this action on October 1, 2018; and

7.      The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   __**June 30, 2022**__                    _____

UNITED STATES DISTRICT JUDGE